**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

-------------------------------------------------------------------x

TREEHOUSE, INC. D/B/A TREEHOUSE         :
GIFT & HOME, on behalf of itself and       :    Civil No.
all other similarly situated persons,       :
                    Plaintiff,   :    Class Action Complaint
                             :
          -versus-         :    Jury Trial Demanded
                             :
AMERICAN EXPRESS COMPANY and      :
AMERICAN EXPRESS TRAVEL RELATED  :
SERVICES COMPANY, INC.,          :
                    Defendants.  :

-------------------------------------------------------------x

Plaintiff Treehouse, Inc. d/b/a Treehouse Gift & Home, on behalf of itself and all others similarly situated, hereby alleges for its Complaint against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex") as follows:

## I.

## INTRODUCTION

1.    This action challenges Amex's rules preventing U.S. merchants from providing consumers with incentives to use forms of payment that are less expensive to the merchant than Amex-branded payment cards (the "Anti-Steering Rules.")  In the absence of the Anti-Steering Rules, consumers would have incentives to use payment forms — such as debit cards, cash, checks, Visa-, MasterCard- and Discover-branded payment cards, and so forth — that impose lower costs upon the merchant than do Amex-branded payment cards.  If merchants were free to give consumers incentives to use less costly payment products, then Amex would be under pressure to reduce its merchant

pricing or lose consumers to cheaper payment forms. The Anti-Steering Rules, however, insulate Amex from any such price-based competition. By ensuring that the consumer neither knows nor cares how expensive her payment product is to the merchant, and thus has no incentive to switch to an alternative payment form, or a competitor of Amex, the Anti-Steering Rules serve to entrench Amex's position of monopoly power in the U.S. markets for corporate, small business, and personal charge card services, among other markets.

2.     The Anti-Steering Rules further ensure that certain merchants seeking to pass along the high merchant discount fees they incur on Amex payment card services must raise their prices to all consumers, including cash-payers, debit card users, and those who would otherwise seek to avoid the high cost of such services. For example, in the absence of the Anti-Steering Rules, the merchant would be free to impose the merchant discount fee directly upon the Cardholder who chooses to use the more expensive Amex-branded payment card. The price of goods and services would fall because those prices would no longer be marked up to reflect artificially inflated merchant discount fees.

3.     In addition to insulating Amex from competition and raising prices for all consumers, the Anti-Steering Rules compel inequitable and anticompetitive subsidies, running from the least affluent U.S. consumers to the most affluent. Because merchants must mark up the price of all goods to cover the costs of accepting Amex-branded payment products — rather than impose the discount fee directly upon Amex Cardmembers or otherwise steer the Cardmember to a cheaper payment form — the Anti-Steering Rules effectively compel cash payers and users of other low cost payment forms to subsidize all of the costly perquisites enjoyed by Cardmembers using Amex-branded

2

payment card products, including frequent flier miles, rental car insurance, free gifts, and even cash-back rewards.

4.    Finally, the Anti-Steering Rules flatly preclude merchants from seeking to compete with one another on the dimension of whether and how they "price" their acceptance services to consumers.   Just as merchants may compete on whether to discount Pepsi relative to Coke, they should also be free to compete on whether to discount Discover card acceptance relative to Amex.   On their face, then, the challenged rules thus harm competition among merchants, quite apart from the harm they inflict upon competition in the payment services industry.

## II.
## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6.    This Court can also exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claim because it is derived from the same nucleus of operative facts as the federal law claims such that Plaintiff would ordinarily expect to try them in one proceeding.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the Defendants may be found or transact business within this District.

## III.

## THE PARTIES

8.      Plaintiff Treehouse, Inc. d/b/a Treehouse Gift & Home is a corporation organized under the laws of the State of Wisconsin, with its principal place of business in Onalaska, Wisconsin. Plaintiff accepts American Express payment cards.

9.      Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

10.      Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

## IV.

## CLASS ACTION ALLEGATIONS

11.      Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act and Chapter 133 of the Wisconsin Statutes.

12.      The class is comprised of all Wisconsin merchants that have accepted Amex-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") in the State of Wisconsin (the "Class"). The Class does not include Amex or its agents, subsidiaries or affiliates.

4

13.     The members of the Class are so numerous that joinder of all members is impracticable.

14.     Questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

15.     The claims of the Plaintiff are typical of the claims of the Class.

16.     Plaintiff and its counsel will fairly and adequately represent the interests of the Class. Plaintiff has retained counsel who is competent and experienced in federal antitrust and class action litigation.

17.     Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

18.     This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

## V.
## FACTUAL BACKGROUND

**Industry Background**

19.     When a consumer presents an Amex-branded payment card to a retailer for payment, the merchant swipes the card and transmits a record of the transaction to Amex. Amex then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers. For a typical retailer in many industries, that discount fee is roughly 3% of the total transaction. At 3%, if a Cardmember presents an Amex-branded

5

payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its Cardmember for $100.

20.     Other payment products are far less costly to the merchant. Debit cards, Discover-branded credit cards, and even most Visa- and MasterCard-branded payment cards carry much lower discount fees than Amex. And of course, cash and checks are likewise far less costly to the merchant. As a result, if merchants were able to steer transactions to payment forms other than Amex, they would realize significant savings. In a competitive retail marketplace, those savings will be passed along to all consumers in the form of lower prices for all.

**The Anti-Steering Rules**

21.     There are many ways that a retailer might steer transactions to a less costly and more efficient payment card, including:

- offering a discount for using a cheaper form of payment, such as Discover-, Visa-, and MasterCard-branded credit cards, debit cards, checks, or cash;

- verbally asking customers if they mind using the cheaper payment form;

- posting signage indicating a preference for the cheaper payment form;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

- imposing a small surcharge for using Amex-branded payment cards (provided the retailer is located in one of the 41 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

22.     Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these efficiency-enhancing practices.

6

23.     The Anti-Steering Rules are set forth in Amex's standard form Card Acceptance Agreement and are available on the "Merchants" section of Amex's website. A typical iteration of the Terms And Conditions For American Express® Card Acceptance Agreement, drawn from Amex's website on January 30, 2007, provides:

> When a customer asks what payment methods are accepted, you will mention the Card. You will honour the Card, and will not attempt to: (1) dissuade the Cardmember from using the Card; (2) criticize or mischaracterize the Card or any services or programs offered in connection with the Card; (3) persuade the Cardmember to use any other credit, charge, debit or smart card or other card, account access device or service; or (4) impose any restrictions or conditions on the use or acceptance of the Card that are not imposed equally on the use or acceptance of other cards.

24.     The Card Acceptance Agreement further provides the merchant may not engage in any practices or programs that "indicate or imply that you prefer Other Payment Products;" nor may the merchant "promote the use of any Other Payment Products more actively than you promote the use of the [Amex] Card."

25.     The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price-based competition in the payment card services markets. A competitor network — such as Discover Financial Services or a new market entrant — may offer to provide comparable services to retailers at a fraction of the price charged by Amex. Such a pro-competitive strategy, however, will not allow this would-be competitor to gain any market share from Amex. The reason that the competitor network cannot gain market share by offering the same services at lower prices is because of the Anti-Steering Rules. The Anti-Steering Rules create a vertical restraint that ensures that the consumer will have no incentive to use the less expensive and more efficient payment

7

medium. And it is the consumer who decides which payment option to use. The Anti-Steering Rules thus render Amex largely impervious to price-based competition.

26.      In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished. Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

27.      Further, the abolition of the Anti-Steering Rules would enable merchants and their customers to avoid the cost of all the frequent flier miles, Membership Rewards Points®, travel insurance, and other perquisites that are financed out of merchant discount fees. Presently, the benefits enjoyed by Amex Cardmembers are subsidized by all consumers, as well as merchants. If merchants were free to offer inducements to use less expensive payment forms, then customers who nonetheless choose to use an expensive payment medium, such as Amex, would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

**Market Definition and Market Power**

28.      Under any appropriate definition of a relevant product market in this case, American Express has substantial market power or monopoly power.

           i.      *American Express Card Acceptance Services Market*

29.      There exists a relevant product market consisting of the services provided to merchants for accepting American Express payment cards. As a result of the challenged Anti-Steering Rules, American Express's ability to impose supra-competitive

prices upon merchants is not meaningfully constrained by price competition from other payment networks. If Amex increases merchant prices significantly over a competitive baseline – or if a competitor network, such as Discover or MasterCard, drops its merchant fees by a significant amount  –  a merchant such as plaintiff has no ability to steer transaction volume away from the expensive Amex network over to the now-cheaper competitor network. In a properly functioning market, Amex could not raise its prices above a competitive baseline without having transaction volume migrate to less expensive networks. In economic terms, then, there is extraordinarily low cross-elasticity of demand as between American Express acceptance services and those offered by other networks. As a result, the product dimension of the relevant market is properly limited to acceptance services for the American Express network.

30.     American Express has monopoly power in the market for American Express card acceptance services.

### ii.     Corporate and Small Business Card Services Markets

31.     There further exist relevant markets, the product dimensions of which are no broader than all corporate and small business card acceptance services.

32.     The majority of Amex's corporate card holding customers – generally, large corporations – mandate that their executives must use the American Express corporate card if they wish to be reimbursed for their business expenses. Amex itself fosters such policies by its clients, which it refers to as "mandated usage" policies. Mandated usage, in turn, generates extraordinary "insistence" on the part of cardholders. Amex then touts these mandated usage policies to merchants, in seeking to justify its high discount fees. The result is that, from the standpoint of merchants, other payment

products are not ready substitutes for corporate card acceptance. Cross-elasticity of demand as between corporate card acceptance services and other acceptance services is extraordinarily low.

33.     Small business cards similarly generate highly inelastic demand due to features such as management reporting and account expense tracking; discounts for typical business expenses; special insurance programs; and robust rewards programs. In addition, small business charge and credit cards are a source of capital for small businesses. According to American Express, the two core needs of small businesses are managing their cash flow and access to information that could help them better manage and grow their business. Small business cards meet both these needs in ways that other cards do not.

34.     American Express has substantial market power or monopoly power in the markets for corporate and small business card acceptance services. Courts sometimes recognize that a high share of a relevant market constitutes evidence of market power in that market. On that measure, Amex's market power is clear. During the Class Period, Amex's share of a multi-brand credit card market has been in the vicinity of 70%, while its share of small business was consistently above 45%.

*iii.     General Purpose Credit and Charge Card Services Market*

35.     Irrespective of the definition of the relevant market – i.e., even if one defines the relevant product market so broadly as to include all credit and charge card services provided to merchants – American Express has market power.

36.     Amex has demonstrated its monopoly power throughout the relevant period by: maintaining supracompetitive discount rates; charging significantly different

prices to different groups of merchants for reasons unrelated to the cost of providing service; establishing prices without regard to the cost of providing services; managing to raise or maintain prices as sales volume increased substantially; and forcing merchants to accept the Anti-Steering Rules.

37. There have existed at all relevant times substantial barriers to entering the payment card services business. The challenged rules foreclose what would otherwise be the most likely and obvious route to entry – viz., the provision of acceptance services to merchants at costs that are below those of competitor networks. For this and other reasons, there have been no successful new entrants in the U.S. credit card network business for over a quarter century – a staggering period of time in any industry.

    *iv.*    *Geographic Dimension*

38. The geographic dimension of each of the above-referenced relevant product markets is the United States.

**Nature of the Injuries**

39. The Anti-Steering Rules injure merchants because, among other things, they insulate Amex from price-based network competition, thereby enabling Amex to extract supra-competitive discount fees. The Anti-Steering Rules only insulate Amex from competitive pressures in merchant pricing because the Rules are imposed across the board, on all U.S. merchants. For any particular merchant, then, this harm is not inflicted merely by Amex prohibiting that merchant from steering. Instead, the particular merchant is harmed because Amex imposes the Anti-Steering Rules upon each new and existing merchant that joins or participates in the Amex network, and because Amex enforces its Anti-Steering Rules.

40.     As a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, merchants have suffered damages.  But for the Anti-Steering Rules, Amex would be compelled to, and would in fact, charge merchants significantly lower discount fees than it presently does. The difference between Defendants' merchant fees and the fees that would apply but for the Anti-Steering Rules represents damages to the merchant Class.

41.     In addition, but for Amex's Anti-Steering Rules, merchants would be free to compete on the dimension of whether and how to discount or otherwise price acceptance services.

## FIRST CLAIM FOR RELIEF

*For Violation Of Chapter 133 of the Wisconsin Statutes,*
*Based On The Imposition And Enforcement Of The Anti-Steering Rules*

42.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

43.     Amex has engaged in and continues to engage in unlawful contracts in an unreasonable restraint of trade in violation of Chapter 133 of the Wisconsin Statutes. These unlawful contracts were entered into and effectuated within the State of Wisconsin.

44.     The Anti-Steering Rules, which Amex imposes on and enforces with respect to every member of the Class, represent an unlawful contract in restraint of trade.  Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card services.

45.     The Anti-Steering Rules have numerous additional anticompetitive effects, including the inflationary pressure they exert on consumer goods and services, the

12

compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

46.     Chapter 133 of the Wisconsin Statutes prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

47.     Amex has and exercises monopoly power in the market for American Express payment card acceptance services, as set forth above.

48.     The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

49.     The Anti-Steering Rules are not necessary to accomplish a legitimate procompetitive benefit to Amex.

50.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules and willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

51.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules and willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

13

52.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### SECOND CLAIM FOR RELIEF

*For Willful Monopoly Maintenance In Violation Of Section 2*
*Of The Sherman Act, 15 U.S.C. §2, Based On The*
*Imposition And Enforcement Of The Anti-Steering Rules*

53.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

54.     Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

55.     Amex has and exercises monopoly power in the market for American Express payment card acceptance services, as set forth above.

56.     The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

57.     The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

58.     Amex's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

59.     As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

60.     As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

61.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### THIRD CLAIM FOR RELIEF

*For Imposition Of Unreasonable Restraints Of Trade*
*In Violation Of Section 1 Of The Sherman Act, 15 U.S.C. §1, Based On*
*The Imposition And Enforcement Of The Anti-Steering Rules*

62.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

63.     Section One of the Sherman Act prohibits contracts in restraint of trade. More specifically, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

64.     Amex has and exercises market power in the relevant markets identified above.

65.     The Anti-Steering Rules, imposed upon every member of the Class by Amex, represent an unlawful contract in restraint of trade.  Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card services.

66.     The Anti-Steering Rules are anticompetitive.  Among the anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of

15

Defendants' high cost payment media, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

67.     There exists no procompetitive justification for the Anti-Steering Rules.

68.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

69.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

70.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

## FOURTH CLAIM FOR RELIEF

*For Imposition Of Unreasonable Restraints Of Trade In Violation Of Section 1 Of The Sherman Act, 15 U.S.C. §1, Based On The Imposition And Enforcement Of The Exculpatory Provisions*

71.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

72.     Section One of the Sherman Act prohibits contracts in restraint of trade.

73.     Amex has and exercises market power in the relevant markets identified above.

74.     In the vast majority of its merchant card acceptance agreements, including its standard form merchant card acceptance agreement, Amex imposes a provision that is meant to immunize and insulate Amex from any class-wide liability for antitrust

16

violations of the nature alleged in this complaint (the "Exculpatory Provisions"). Under the Exculpatory Provisions, a merchant (i) forfeits the ability to act as a representative plaintiff in any class action; (ii) forfeits the ability to be a passive class member (and presumably share in the benefit of any award) in a class action; and (iii) forfeits any right to have his or her claim consolidated or aggregated with any claim asserted by any other merchant against Amex.

75.      As a direct and foreseeable result of Defendants' willful imposition of the Exculpatory Provisions, American Express can reap tens of millions of dollars in overcharges from Wisconsin merchants each year, comfortable in the knowledge that it is wholly immunized from damages suits (or, at most, is exposed only to damages claims by the largest merchants, whose economic interests are sufficient to warrant the extraordinary expense of large-scale one-on-one antitrust litigation).

76.      Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

77.      Defendants' imposition and enforcement of the Exculpatory Provisions is likely to continue if not enjoined.

WHEREFORE, Plaintiff respectfully seeks an Order:

A.      Directing that the instant action for injunctive relief may be maintained as a Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

B.      Directing that the instant action for damages may be maintained as a Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(3);

C.      Declaring that the Amex Anti-Steering Rules are illegal and directing their rescission;

17

D.      Declaring that the Amex Exculpatory Provisions are unenforceable as applied in this action;

E.      Directing Defendants to cooperate with Plaintiff in the establishment, funding and execution of a campaign that adequately informs merchants and consumers of the rescission of the Anti-Steering Rules;

F.      Awarding damages in an amount to be determined at trial and then trebled;

G.      Awarding attorneys' fees and costs of suit; and

H.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues so triable.

Dated:  December 10, 2010

Respectfully submitted,

Brian G. Weber
**JOHNS, FLAHERTY & COLLINS, S.C.**
205 Fifth Avenue South, Suite 600
P.O. Box 1626
La Crosse, WI 54601
Telephone: (608) 784-5678
Fax: (608) 784-0557
brian@johnsflaherty.com

Daniel E. Gustafson
Jason S. Kilene
Daniel C. Hedlund
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
dhedlund@gustafsongluek.com

*Counsel for Plaintiff Treehouse, Inc. d/b/a*
*Treehouse Gift & Home and the Proposed*
*Class*

19